# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MANDIP K. SINGH,

                         Plaintiffs,

-against-

KNUCKLES, KOMOSINSKI & MANFRO, LLP
and DEBBIE BHOORASINGH, individually,

                    Defendant.

Case No.:  18-cv-3213

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

Knuckles, Komosinski & Manfro, LLP
50 Tice Boulevard, Suite 183
Woodcliff Lake, New Jersey 07677
(201) 391-0370

John E. Brigandi, Esq.
On the Brief

1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………...……………………………………….……ii

PRELIMINARY STATEMENT……………………...…………………………….2

SUMMARY OF FACTS………………………………...……………………….…..4

LEGAL ARGUMENT………………………………………………………....10

    A.  Legal Standard on a Motion for Summary Judgment……………….………....10

    B.  Plaintiff's Complaint Must be Dismissed……………………………..……….11

        i.   Governing Law…………………...………………….…………....11

        ii.  Plaintiff Is Unable To Establish a Prima Facie Case of Unlawful
Discrimination……………………………………………………………14

        iii. Plaintiff is Unable to Demonstrate that Discrimination was the True Motivation
for her Termination…………………………………………………….18

    CONCLUSION…………………………………………………………....20

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

42 U.S.C. §2000(e)-2(a)…………………………………………………………..………..9

42 U.S.C. § 2000(e)(k)……………………………………………………………...……………..9

Aikens, 460 U.S. at 715…………………………………….…………………………….....11

Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)…..……………………..………….....10

Baffa v. STAT Health Immediate Medical Care, P.C.,

      2013 WL 5234231, at * 7 (E.D.N.Y. Sept. 17, 2013)……………………..……….11

Bickerstaff      v.      Vassar      Coll.,      196      F.3d      435,      446      (2d      Cir. 1999)………………………….…..……...12

Dister      v.      Cont'l      Grp.,      Inc,      859      F.2d      1108,      1115      (2d      Cir. 1988)…………………………......…….12

Elaine      W.      v.      Joint      Diseases      N.      Gen.      Hosp.,      81      NY2d      211,      216, (1993)…………………………..14

Executive                Law                §                296                (1) (a)…………………………………………………………14

Fed.R.Civ.P. 56(a)………………………………………………………….……………....10

Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities,

      115 F.3d 116, 119 (2d Cir. 1997)…………………………….…………….…………11

Furnco      Constr.      Corp.      v.      Waters,      438      U.S.      567,      577 (1978)…………………………….……..…….13

Gallo      v.      Prudential      Res.      Servs.,      Ltd.      P'ship,      22      F.3d      1219,      122      (2d      Cir. 1994)…………......……..12

Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)…………………………….………12

Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998)…………………………….18

Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130 (2d Cir. 2006)………………………...………..…19

James v. N.Y. Racin Ass'n., 233 F.3d 149, 157 (2d Cir. 2000)…………………………...………13

LaFond v. Gen, Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995)………………….…..……12

Layaou v. Xerox Corp., 999 F.Supp. 426, 432 (W.D.N.Y.1998)…………………………...…..20

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)…..………….….10

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)……………………….……11

New York State Executive Law §296…………………………………………………………….2

Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998)……………………………...…..13

Perry v. N.Y. Dep't of Labor, 2009 WL 2575713, at * 3-4, (S.D.N.Y. Aug. 20, 2009)

aff'd 2010 WL 3611401 (2d Cir. Sept. 17,2010)…………………………………...…..20

Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995)……………………………….……..11

Rainer N. Mitti, Ophthalmologist, P.C. v. New York State Div. of Human Rights, 100 NY 2d 326 (2003)……………………………………………………..…..13

Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 148-149 (2000)…………………...…….18

Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107, n. 10 (2d Cir. 2011)………….13

Rosen v. Columbia Univ., 1995 WL 464991, at * 7 (S.D.N.Y Aug. 7, 1995)………………….....19

Saenger v. Montefiore Med. Center, 706 F. Supp.2d 494, 507 (S.D.N.Y. 2010)…………………18

Saks v. Franklin Covey, Co., 315 F.3d 337, 343 (2d Cir. 2003)……………………………...…11

Spiegel v. Schulmann, 604 F.3d 72, 83 (2d Cir. 2010)……………………………………….....13

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993)……………………….…….…..11

Texas Dep't of Community Affairs v. Burdline, 450 U.S. 248, 252-53 (1981)……….……...….14

Thornley v. Penton Publi'g., Inc., 104 F.3d 26, 30 (2d Cir. 1997)……………...…………...…19

Title VII of the Civil Rights Act of 1964………………………………………………...……2

U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)…………………...…..12

Valentine v. Standard & Poor's, 50 F.Supp.2d 262, 284 (S.D.N.Y. 1999)…………………….19

W. World ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)…………………………..19

Defendants Knuckles, Komosinski & Manfro, LLP ("KKM") and Debbie Bhoorasingh ("Bhoorasingh") (collectively, "Defendants") submit the instant memorandum of law in support of their motion for summary judgment seeking an order dismissing Plaintiff Mandip K. Singh's ("Plaintiff") Complaint, with prejudice.

## I.      PRELIMINARY STATEMENT

Plaintiff Mandip Singh ("Plaintiff") filed this action against Defendants for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), and the New York State Executive Law §296 ("NYSEL"), contending that her employment at KKM was terminated by Defendants due to her pregnancy. As set forth more fully below, her claims are without merit as Plaintiff was terminated from KKM for excessive absences, tardiness, and an inability to perform duties in a timely fashion. Thus, she is unable to demonstrate that she performed her job satisfactorily, nor that she was terminated under circumstances giving rise to any inference of discrimination.

During Plaintiff's employment at KKM from October 31, 2016 to July 21, 2017, Plaintiff was out of the office, or left early, approximtely forty-eight (48) times for a variety of seemingly unconnected reasons. Aproximately half of these absences occurred prior to Plaintiff advising that she was pregnant, and several times Plaintiff failed to even advise KKM that she would not be coming to work. Due to the excessive absences which caused inter personnel issues in the evictions department, KKM transferred Plaintiff to the foreclosure sales department. The absences continued. As a result, KKM was required to re-assign staff from other departments to ensure that work assigned to Plaintiff was properly being completed in a timely manner, in an effort to avoid KKM's clients from incurring costs for the adjournment or cancellation of foreclosure sales. It did so at its own cost by authorizing other

employees to work overtime hours in order to complete Plaintiff's duties.   Ultimately, the situation became untenable and Plaintiff was transferred back to the evictions department at the same pay rate and work hours.

Throughout her entire employment, KKM provided Plaintiff with numerous opportunites to be successful by catching up on her work. Several meetings were held with Plaintiff and her supervisors to discuss her expectations and prioritize her workload; KKM instituted new processes and created new templates for Plaintiff; Plaintiff's workload was reduced; Plaintff was permitted to work weekends; and, KKM repeatedly re-assigned employees to assist Plaintiff with her day to day duties.   It was during this period that Plaintiff was twice hospitalized and placed on bed rest resulting in additional absences.   KKM became concerned as Plaintiff had left the office during work to visit the emergency room for severe pain, and it spoke with an outside HR representative to determine how to proceed. It was determined that because of Plaintiff's continued absences and having to be on bedrest, that KKM should ensure that it was providing reasonable accomodations to Plaintiff to assist her in performing her job duties.   Plaintiff understood, and provided KKM with a form permitting it to speak with her medical provider. Her nurse practitioner subsequently signed a form providing that Plaintiff could perform her work duties without any accomodations. KKM permitted Plaintiff to continue working, yet Plaintiff continued her absences. As a result of her excessive absences, inability to be at work on a consistent basis, inability to perform duties assigned to her in a timely manner, and because KKM was incurring expenses in re-assigning its employees to perform Plaintiff's work, Plaintiff was terminated.   Plaintiff was not, and cannot demonstrate, that KKM terminated her employment based upon her pregnancy. Therefore, her claims fail as a matter of law.

## II.    SUMMARY OF FACTS[1]

Plaintiff began her employment at KKM on October 31, 2016 as an eviction clerk. Plaintiff was re-assigned from the eviction department to the foreclosure sales department on January 10, 2017, due to personnel issues with the eviction staff.  The decision was made after several meetings with various team members within the eviction department, as the staff was not working together cohesively due to Plaintiff's excessive absences and failure to complete her duties. Plaintiff's hourly rate did not change as a result of the employment re-assignment.

Under KKM policy, after ninety (90) days of employment, all employees are entitled to thirteen (13) paid leave days during each calendar year. Prior to then, employees may only obtain unpaid leave.  From Plaintiff's first day of employment on October 31, 2016 to January 18, 2017, Plaintiff either called out of work, or left work early, six (6) times, and was not compensated for these days:

- On November 10, 2016, Plaintiff left work at 12:44 pm due to a family emergency;
- On December 5, 2016, Plaintiff left a voicemail stating she was not feeling well and would not be coming to work;
- On December 22, 2106, Plaintiff left a voicemail stating she was not feeling well and would not be coming to work;
- On January 16, 2017, Plaintiff left early as she was not feeling well;
- On January 17, 2017, Plaintiff sent a text message to Bhoorasingh advising she was not feeling well and would not be coming to work;
- On January 18, 2017, Plaintiff sent a text message to Bhoorasingh advising she was not feeling well and would not be coming to work.

On or about February 3, 2017, Bhoorasingh held a meeting with the foreclosure sales staff to discuss, among other things, Plaintiff's performance.  In this meeting, Bhoorasingh was informed that Plaintiff was again not meeting deadlines.  Therefore, KKM had to assign additional staff to assist the sales department to complete Plaintiff's duties in a timely manner.

---

[1] The facts below are merely a summary of those set forth in Defendants' Statement of Material Facts attached to the instant motion.  Defendants' Statement of Material Facts includes citations to the record in accordance with Fed.R.Civ.P. 56.

As a result of this meeting, KKM instituted a process detailing when and how work should be performed for all Plaintiff's tasks to ensure that Plaintiff's workload could be completed by the close of business each day.  Plaintiff's supervisor assisted with this process by creating a template for Plaintiff to utilize in her daily tasks, which included goals to be completed by the each day to avoid overburdening Plaintiff with too many duties

Following her ninetieth day of employment, Plaintiff accrued thirteen (13) paid leave days on January 29, 2017. From February 13, 2017 to June 5, 2017, Plaintiff used all thirteen (13) paid leave days provided.

- On February 13, 2017, Plaintiff advised via text message that she was not feeling well and would not be coming in to work;
- On February 17, 2017, Plaintiff left work early due to a doctor's appointment;
- On February 23, 2017, Plaintiff left work early at 10:32 am as she was not feeling well and needed to go to the hospital;
- On February 24, 2017, Plaintiff did not come into work as she had a doctor's note from her hospital visit;
- On March 23, 2017, Plaintiff advised via text message that she was not feeling well and would not be coming in to work;
- March 31, 2017, whereby Plaintiff asked to be excused for a death in the family;
- April 12, 2017, whereby Plaintiff requested a half-day;
- April 26 through April 28, 2017, whereby Plaintiff requested leave to schedule a medical procedure.

On May 5, 2017, a meeting was held with Plaintiff to discuss KKM's expectations of her employment. During this meeting, Plaintiff was advised that she must complete her work in a timely manner as her failure to do so was causing pending foreclosure sales to be adjourned or cancelled at a cost to KKM's clients.

However, Plaintiff continued her absences, which were now unpaid, as follows:

- On May 18, 2017, Plaintiff advised via text message to Bhoorasingh that she was not feeling well and would not be coming to work;
- On May 23, 2017, Plaintiff came in to work late at 11:51 am. No reason was provided;
- On May 25, 2017, Plaintiff advised via text message to Bhoorasingh that she was not feeling well and would not be coming to work;
- On May 26, 2017, Plaintiff was excused from work due to strep throat.

5

Later on May 25, 2017, Plaintiff advised via text message to Bhoorasingh that she was pregnant, and that she had strep throat.  Plaintiff further advised that she would provide a doctor's note indicating she would no longer be contagious as of May 28, 2017, and would be able to return to the office on May 29, 2017.  As a result, KKM management assigned additional staff to the foreclosure sales department on May 25, 2017, to avoid upcoming sales for the following day from being adjourned at a cost to KKM's clients.

When Plaintiff did return to work on May 30, 2017, Plaintiff's supervisor sent a list of files that Plaintiff was to complete by the close of business.  Based upon the workload provided, there was no reason Plaintiff could not have performed the work requested.  In response, Plaintiff advised she would try to complete them.  Due to Plaintiff's response, KKM management assigned additional staff to complete the work and authorized the re-assigned staff overtime compensation to complete their additional duties.  On June 3, 2017, Plaintiff's supervisor provided Plaintiff an updated process detailing when and how all work should be performed for all assigned tasks.

Plaintiff again was absent for twenty-three (23) full days or half days, from June 5, 2017 to July 18, 2017, as follows:

- On June 5, 2017, Plaintiff left work early stating that she was very ill and would need to go to the hospital;
- On June 6, 2017, Plaintiff advised via text message to Bhoorasingh that she would not be in for the remainder of the week (June 6 to June 9), as she was placed on bed rest;
- On June 12, 2017, Plaintiff advised via text message to Bhoorasingh that she would be out of the office until June 14, 2017.

In response, Bhoorasingh requested Plaintiff to call the office. Plaintiff failed to do so, instead sending an email providing a copy of a doctor's note excusing her from work for the period of June 5, 2017 to June 13, 2017.  Bhoorasingh replied that Plaintiff had no paid leave

remaining, and further provided Plaintiff with a disability form to be completed. Plaintiff failed to complete the disability form.

During these absences, KKM management again had to re-assign staff to the foreclosure sales department to complete Plaintiff's duties. Bhoorasingh again authorized overtime to the re-assigned staff to complete Plaintiff's duties. On June 14, 2017, Plaintiff was re-assigned back to the evictions department to avoid further cancellations of foreclosure sales resulting in additional fees and costs to be incurred by KKM's clients. Plaintiff's hourly rate and hours remained the same.

- On June 15, 2017, Plaintiff left work early at 12:30 pm. Said request was approved for unpaid leave;
- On June 19, 2017, Plaintiff requested to leave the office at 10:30 am as she was not feeling well. Plaintiff went to the emergency room where she was treated for severe stomach pain;
- On June 20, 2017, Plaintiff emailed Bhoorasingh a doctor's note stating that Plaintiff would be excused from work for June 20 and June 21, 2017 as she was on bed rest due to the pain.

That same day, Bhoorasingh met with Plaintiff's supervisor who expressed concerns as to Plaintiff's ability to perform her duties. Plaintiff's supervisor further advised that Plaintiff was not completing tasks timely, often seemed distracted, complained about work, and was often not at her desk.

Following this meeting, Bhoorasingh sent an email to Plaintiff enclosing a patient authorization form for Plaintiff to execute and return so that KKM could communicate with Plaintiff's medical care provider to confirm she could perform duties assigned to her. Said email additionally requested a note from Plaintiff's doctor authorizing her return to work on June 22, 2017, and information as to whether Plaintiff could resume her duties. Bhoorasingh did so after speaking with an outside HR representative, Cathy Gatto. It was determined that because of Plaintiff's continued absences, having to be on bedrest, and various health issues,

7

that KKM should ensure that it was providing reasonable accommodations to Plaintiff to assist her in performing her job duties.

On the morning of June 22, 2017, Plaintiff and Bhoorasingh spoke via telephone whereby Plaintiff stated she did not receive an email with the patient authorization form, and that she had already left her doctor's office so that she would not be able to provide a note. Bhoorasingh informed Plaintiff that KKM wanted her to continue her employment, but needed the doctor's note and signed patient authorization form to determine whether Plaintiff required special work accommodations.   Plaintiff failed to report to work following this telephone call on June 22, 2017.

- On June 23, 2017, Plaintiff failed to appear for work. No telephone call was made or email sent by Plaintiff;
- On June 26, 2017, Plaintiff appeared at work but failed to provide a signed patient authorization form.  Bhoorasingh informed Plaintiff that she must complete the form before she could return to work. Plaintiff left the office at 9:34 am, and did not return;
- On June 27, 2017, Plaintiff failed to appear for work.  Bhoorasingh sent Plaintiff an email advising that if she was not going to come to work, she must advise KKM or Bhoorasingh.  Bhoorasingh additionally requested the patient authorization form and doctor note.  In response, Plaintiff provided an unsigned authorization form.
- On June 28, 2017, Bhoorasingh sent Plaintiff an email in response advising of the deficient patient authorization form, and requesting Plaintiff provide a complete form so that KKM could contact Plaintiff's doctor so that Plaintiff could return to work. Plaintiff did not come to work on June 28, June 29 or June 30.

On June 30, 2017, Plaintiff sent an email attaching the patient authorization form, and providing contact information for her medical provider, Dipan Kaur.  Bhoorasingh advised she would reach out to her doctor on July 5, due to the holiday weekend.   Plaintiff then thanked Bhoorasingh for all that she has done to accommodate her needs.

On July 5, 2017 Bhoorasingh attempted to contact Dipan Kaur with the contact information provided by Plaintiff. The facility advised that Dipan Kaur did not work there, and provided an alternative number.  Bhoorasingh then called the alternative telephone

8

number, and was advised she was calling a Dr. Naqvi's office, but that Dr. Naqvi was with a patient and would be unable to speak with her. Dr. Naqvi's office further advised they had no record of Plaintiff at this facility, but she could be under the care of Dipan Kaur based on a hospital or nursing home visit.

Bhoorasingh then advised Plaintiff of her telephone conversation with Dr. Naqvi's office, whereby Plaintiff explained that Dipan Kaur was not actually a doctor, but a nurse practitioner whom she considered to be her doctor. Significantly, Dipan Kaur whom Plaintiff described as a friend from the local temple, did not provide any treatment to Plaintiff for her pregnancy.

Bhoorasingh then sent correspondence, via fax, to Dipan Kaur requesting: (a) confirmation that Plaintiff could work Monday to Friday from 9 am to 5pm, in front of a computer; (b) confirmation that Plaintiff could use standard office machinery such as a copy machine, scanner, postage machine; and, (c) information as to whether Plaintiff would require any accommodations for her employment.

- Plaintiff did not come to work on July 5, 2017;
- On July 6, 2017, Bhoorasingh advised Plaintiff that KKM was still waiting for a signed letter from Dipan Kaur. Plaintiff did not work on July 6, July 7, or July 10, 2017;
- On July 10, 2017, Bhoorasingh received a letter from Dipan Kaur advising Plaintiff could return to work on July 11, 2017. Bhoorasingh contacted Plaintiff advising she could return to work the following day. However, Plaintiff stated she had several appointments on July 11, 2017, and would not be able to return to the office until July 12, 2017. As such, Plaintiff did not work on July 11, 2017.

On July 12, 2017, Plaintiff appeared for work and met with her supervisor to discuss her expectations. Plaintiff's supervisor advised Bhoorasingh that she had concerns as to Plaintiff's ability to perform tasks and her effectiveness at completing tasks.

- On July 14, 2017, Plaintiff advised Bhoorasingh she would be late for work on July 18, 2017 due to a doctor appointment. However, on July 18, 2017, Plaintiff notified

Bhoorasingh that her appointment was taking longer than expected.  Plaintiff never appeared at work on July 18, 2017.

- On July 21, 2017, Plaintiff sent a text message to Bhoorasingh advising she was not feeling well and would not be coming to work.

Plaintiff testified at her deposition that the reason she called-out on July 21, 2017 was because she suffered a fall the night before. This information was not conveyed to Bhoorasingh.

On July 21, 2017, Bhoorasingh sent an email to Plaintiff advising her employment from KKM was being terminated.  Plaintiff was terminated for her inability to be at work on a consistent basis and an inability to perform duties assigned to her in a timely manner, both of which caused KKM to re-assign its employees to complete Plaintiff's duties at an additional expense.  Neither Plaintiff's pregnancy nor her gender played any role in her termination. Rather, the undisputed facts demonstrate that Defendants repeatedly attempted to accommodate Plaintiff's needs to allow Plaintiff an opportunity to continue her employment with KKM.  KKM did not replace Plaintiff with a specific employee. Instead, Plaintiff's responsibilities were dispersed to other employees.

## III.   LEGAL ARGUMENT

### A.   Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  A moving party is entitled to summary judgment "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  "A mere scintilla of evidence" is insufficient to overcome

summary judgment." Id. at 249-250. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-248.

**B.    Plaintiff's Complaint Must be Dismissed**

**i.    Governing Law**

Title VII prohibits discrimination against an employee based on her gender. See 42 U.S.C. §2000(e)-2(a); Baffa v. STAT Health Immediate Medical Care, P.C., 2013 WL 5234231, at * 7 (E.D.N.Y. Sept. 17, 2013). The Pregnancy Discrimination Act amended Title VII's definition of gender discrimination to include disparate treatment "because of or the basis of pregnancy, childbirth, or related medical conditions." Id., citing 42 U.S.C. § 2000(e)(k); see also Saks v. Franklin Covey, Co., 315 F.3d 337, 343 (2d Cir. 2003).

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment action was motivated, at least in part, by an "impersissbile reason," i.e., that there was a discriminatory intent. Baffa 2013 WL 5234231, at * 7, quoting Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 119 (2d Cir. 1997). In the absence of direct evidence of discrimination, a plaintiff must satisfy the three step McDonnell Douglas test. Buffa 2013 WL 5234231, at * 7; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Texas Dep't of Community Affairs v. Burdline, 450 U.S. 248, 252-53 (1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993).

"First, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination." Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995). A plaintiff must show that (1) she was a member of the protected class; (2) she satisfactorily

performed the duties required by the position; (3) she was discharged; and (4) under circumstances giving rise to an inference of discrimination. Id.

Second, where a plaintiff makes out a prima facie case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason for discharging the employee. Id. (citing Gallo v. Prudential Res. Servs., Ltd. P'ship, 22 F.3d 1219, 122 (2d Cir. 1994)). Dister v. Cont'l Grp., Inc, 859 F.2d 1108, 1115 (2d Cir. 1988) ("To dispel the inference of discrimination arising from the establishment of a prima facie case, [a defendant] is required to articulate – but not prove – a legitimate, nondiscriminatory reason for the discharge") (citations omitted). Thus, a defendant's burden of production "is not a demanding one." Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999).

If the employer articulates a non-discriminatory reason for its behavior, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted). At this stage, all presumptions drop from the analysis and the fact-finder simply decides "whether [by a preponderance of the evidence] the defendant intentionally discriminated" against plaintiff on the basis of pregnancy. U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); see also Hicks, 509 U.S. at 510-12 ("If, on the other hand, the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework – with its presumptions and burdens – is no longer relevant"). This inquiry is often framed as whether a plaintiff could present evidence sufficient to show the defendant's proffered reason for the termination was pretexual. See LaFond v. Gen, Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

"It is not sufficient, however, for a plaintiff merely to show that she satisfies 'McDonnell Douglas's minimal requirements of a prima facie case, and to put forward 'evidence from which a

factfinder could find that the employer's explanation… was false.'" <u>Baffa</u> 2013 WL 5234231, at
* 8, <u>quoting</u> <u>James v. N.Y. Racin Ass'n.</u>, 233 F.3d 149, 157 (2d Cir. 2000). "Instead, the key is
whether there is sufficient evidence in the record from which a reasonable trier of fact could find
in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence
to support an inference of discrimination." <u>Baffa</u> 2013 WL 5234231, at * 8. "As the Second
Circuit observed in <u>James</u>, 'the way to tell whether a plaintiff's case is sufficient to sustain a
verdict is to analyse the particular evidence to determine whether it reasonably supports an
inference of the facts plaintiff must prove – particularly discrimination. <u>Id</u>. <u>Quoting</u> <u>James</u> 233
F.3d at 157.

 Thus, burden shifting is not "intended to be rigid, mechanized, or ritualistic. Rather, it is
merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears
on the critical question of discrimination." <u>Aikens</u>, 460 <u>U.S.</u> at 715 (quoting <u>Furnco Constr. Corp.</u>
<u>v. Waters</u>, 438 <u>U.S.</u> 567, 577 (1978)); <u>see also</u> <u>Norton v. Sam's Club</u>, 145 F.3d 114, 118 (2d Cir.
1998) ("The thick accretion of cases interpreting this burdenshifting framework should not
obscure the simple principle that lies at the core of antidiscrimination cases. In these, as in most
other cases, the plaintiff has the ulitmate burden of persuasion").

 Pregnancy discrimination claims brought under state law such as NYSEL are analyzed
under the same burden shifting framework in <u>McDonnell Douglas</u>. <u>Spiegel v. Schulmann</u>, 604
F.3d 72, 83 (2d Cir. 2010); <u>Rainer N. Mitti, Ophthalmologist, P.C. v. New York State Div. of</u>
<u>Human Rights</u>, 100 NY 2d 326 (2003). Such claims have been described as "analytically
identical." <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 107, n. 10 (2d Cir. 2011)
(citation omitted). While the NYSEL does not explicitly name pregnancy as a type of
discrimination, the New York Court of Appeals has consistenctly held that employment

discrimination on the basis of pregnancy falls within the prohibitions of Executive Law § 296 (1)
(a) as sex or gender discrimination.  See Mitti, 100 NY 2d at 330 (2003) (holding "the Human
Rights Law … prohibits discharge of an employee because of pregnancy"); Elaine W. v. Joint
Diseases N. Gen. Hosp., 81 NY2d 211, 216 (1993) (holding that "distinctions based solely upon a
woman's pregnant condition constitute *sexual* discrimination") (emphasis added and citations
omitted).

### ii.  Plaintiff Is Unable To Establish a Prima Facie Case of Unlawful Discrimination

Plaintiff is unable to demonstrate that she "performed her job satisfactorily," or that she
was terminated "under circumstances giving rise to an inference of discrimination." McDonell
Douglas, 411 U.S. at 802.  The burden is on Plaintiff, and her failure to do so is fatal to her claim.
See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (holding the burden of
proof falls on the employee in pregnancy discrimination cases).

As an initial matter, Plaintiff was employed by KKM for less than nine months, yet was
absent from work, or left early, forty-eight times. In some instances, Plaintiff failed to even notify
KKM that she would not be coming to work. The records speaks for itself.  Notwithstanding,
Plaintiff was hired as an eviction clerk at KKM on October 31, 2016.  In less than three months,
Plaintiff was re-assigned to the foreclosure sales department on January 10, 2017, due to
personnel issues with the eviction staff caused by Plaintiff's excessive absences and failure to
timely complete her work. (Bhoorasingh Decl. ¶ 2)  Plaintiff continued her pattern of excessive
absences in the foreclosure sales department.  The absences required KKM to re-assign its
employees from other departments to perform Plaintiff's duties to avoid cancellations of
upcoming foreclosure sales, which would have resulted in additional fees and costs to be paid by
KKM's clients.  In doing so, KKM incurred its own costs in the form of authorized overtime for

14

re-assigned staff to complete Plaintiff's work in addition to their regular duties. (Bhoorasingh Decl. ¶¶ 11, 12, 22, 29, 31, 37)   After only five months in the foreslcosure sales department, KKM had no choice but to re-assign Plaintiff back to the evictions department on June 14, 2017, due to Plaintiff's failure to consistently come to work.  (Bhoorasingh Decl. ¶ 37)

Before transferring Plaintiff to the evictions department however, KKM provided Plaintiff with numerous opportunites to catch-up on her work, and be successful in her position.  KKM had Plaintiff's supervisors meet with her several times to discuss her expectations, workload and how to prioritize her workload.  (Bhoorasingh Decl. ¶¶ 11, 12, 22, 28, 30; Exh.'s F, H, I)  KKM instituted a process detailing when and how work should be performed for all Plaintiff's tasks to ensure that Plaintiff's workload could by completed by the close of business each day. (Bhoorasingh Decl. ¶¶ 12, 30; Exh.'s I, L)  Plaintiff's supervisors assisted with this process by creating a template for Plaintiff to utilize in her daily tasks, which included goals to be completed by the end of each day in an effort to avoid overburdening Plaintiff with too many duties. (Bhoorasingh Decl. ¶ 12, Bhoorasingh Tr. p. 87-89)  KKM allowed Plaintiff to come in late, leave early, and permitted Plaintiff to work on weekends to accomplish her goals which still were not being timely completed.  It even assigned additional staff to Plaintiff's department to catch-up on the work not being timely performed. (Bhoorasingh Decl. ¶¶ 22, 27, 29, 31, 37)  Despite these accomodations, Plaintiff continued her pattern of excessive absences.

It was not until May 25, 2017, approximately five months after being assigned to the foreclosure sales department that Plaintiff for the first time advised KKM that she was pregnant. (Exh. A. p. 117) Plaintiff maintains that it was during the two month period between May 25, 2017, and the date of her termination on July 21, 2017, that Defendants began discriminating against her (Singh Tr. p. 34).  However, nothing substantially changed.  Plaintiff continued her

absences, which were all excused by KKM including a week of absences from June 5 to June 13, 2017 due to her initial bed rest.

While Plaintiff was transferred back to the evictions department on June 14, 2017, Plaintiff continued to be compensated at the same hourly rate, and was expected to work the same hours as her position in the foreclosure sales department. (Bhoorasingh Decl. ¶ 37)  The transfer was solely due to Plaintiff's absences, which as described above, caused KKM to incur additional costs and expenses.  Plaintiff testified during her deposition that when she returned to the office on June 14, 2017, everything went back to normal and she resumed her duties.  (Singh Tr. p. 46)

However, the same day she was transferred to the evictions department, Plaintiff requested to leave early the following day June 15, 2017, which was approved. (Exh.'s E, L ) Plaintiff again requested to leave early on June 19, 2017 as she was not feeling well. (Bhoorasingh Decl. ¶ 39) This request was also approved. Plaintiff then went to the emergency room where she was treated for severe stomach pain, and placed on bedrest for the second time through June 21, 2017. (Singh Tr. p. 53-56, Exh. M)  On June 20, 2017,  Bhoorasingh met with Plaintiff's supervisor who expressed concerns as to Plaintiff's ability to perform her duties, as she was not timely completing tasks, often seemed distracted, complained about work and was often not at her desk. (Bhoorasingh Decl. ¶ 41; Bhoorasingh Tr. p. 24)

Following the meeting on June 20, 2017, Bhoorasingh sent Plaintiff an email requesting a doctor's note authorizing her to return to work without restrictions, and further provided Plaintiff with a patient authorization form to be completed so that KKM could communicate with her doctor to confirm she could perform duties assigned to her. (Exh. N)  KKM did so after after speaking with an outside HR representative, Cathy Gatto.  It was determined that because of Plaintiff's continued absences, having to be on bedrest, and various health issues, that KKM

16

should ensure that it was providing reasonable accomodations to Plaintiff to assist her in performing her job duties. (Bhoorasingh Decl. ¶ 42; Bhoorasingh Tr. p. 33, 39, 59, 63)  It was during this time that Plaintiff was suffering complications with her pregnancy as she described during her deposition as raised blood pressure, irritable bowel syndrome issues, and worsening of asthma symptoms. (Singh Tr. p. 47-49)  Indeed, these complications caused Plaintiff to leave work and go to the emergency room on June 19, 2017, due to severe stomach pains resulting in her second bed rest.  (Singh Tr. p. 55-56)  Plaintiff understood KKM's concerns as Bhoorasingh had discussed it with her (Singh Tr. p. 63), and she complied with KKM's request, albeit belatedly and only after numerous follow-ups. (Exh.'s O, P, Q)

On June 30, 2017, Plaintiff finally provided the completed patient authorization form to Bhoorasingh (Exh. Q), who then attempted to contact Plaintiff's nurse practioner on July 5, 2017, following the holiday weekend. (Bhoorasingh Decl. ¶¶ 50-51) Defendants did not receive any correspondence from Plaintiff's nurse practioner until July 10, 2017, who then advised that Plaintiff could return to work on July 11, 2017, without any restrictions[2]. (Exh. R)  Plaintiff had several doctor appointments that day, so she did not come to work until July 12, 2017. (Bhoorasingh Decl. ¶¶ 54-55)   Plaintiff  did not come in to work on July 18, or July 21, 2017. (Bhoorasingh Decl. ¶¶ 56-57, Exh. A p. 120)   It was at this time that Defendants made the decision to terminate Plaintiff due to her excessive absences, inability to be at work on a consistent basis, inability to perform duties assigned to her in a timely manner, and because KKM was incurring expenses in re-assigning its employees to perform Plaintiff's work.  (Bhoorasingh Decl. ¶ 60)

---

[2] Significantly, the nurse practioner who provided this authorization, and prior notes, stated during her deposition repeatedly that she did not provide Plaintiff with any treatment for her pregnancy. (Kaur Tr. p. 58, 53-54)  Plaintiff described Ms. Kaur as a friend from her local temple who provided some medical treatment to her before and after her pregnancy. (Singh Tr. p. 37)

Based upon the foregoing, Plaintiff is unable to demonstrate that she performed her job satisfactorily, or that she was terminated under circumstances giving rise to an inference of discrimination.   She is unable to establish a prima facie showing of unlawful discrimination accordingly.  <u>Burdine</u> 450 U.S. at 253.

### ii.  **Plaintiff is Unable to Demonstrate that Discrimination was the True Motivation for her Termination**

Given that Defendants have articulated  legitimate, and non-discriminatory reasons for the decision to terminate Plaintiff's employment, the burden shifts back to Plaintiff to provide by a preponderance of evidence that Defendants' purported reasons were mere pretext and that unlawful discrimination was the true motivation. <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 52 (2d Cir. 1998) ("the burden of production then shifts to the defendant who must proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination").   The burden at this stage is one of production, not persuasion. <u>Saenger v. Montefiore Med. Center</u>,  706 F. Supp.2d 494, 507 (S.D.N.Y. 2010).  To do so, a plaintiff must satisfy the ultimate burden of proving "the employer's proffered reason is merely pretext for its intentional discrimination." <u>Greenway</u>, 143 F.3d at 52.  In determining whether Plaintiff has met her burden, the Court must analyze the evidence in the record to determine: (1) the strength of her *prima facie* case; (2) the probative proof of Defendants' legitimate non-discriminatory reasons were false (if any); and (3) any evidence that supports or undermines Defendants' justification. <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 <u>U.S.</u> 133, 148-149 (2000).

Plaintiff cannot meet this burden.   Indeed, Plaintiff is unable to articulate any facts supporting her claim for discrimination other than what was alleged in her Complaint concerning Bhoorasingh's request for the doctor note and patient authorization form.  (Singh Tr. 83-84)

When asked during her deposition as to why she believes she was being discriminated against, she vaguely asserted that Bhoorasingh treated her differently.

> Q:  "What actions lead to you to believe that you were being terminated due to your pregnancy?"
>
> A:  "I had a condition before pregnancy which it seemed like it was ok and after pregnancy it seemed like it was very harder to come back to work for my absences. Everything had changed after my pregnancy after coming back to work has changed[3]."  (Singh Tr. 68-69)

Plaintiff further specified that the discrimination was limited to Bhoorasingh's attitude and behavior which changed.  (Singh Tr. 69, 82-83)  Plaintiff never reported said discrimination to anybody at KKM (Singh Tr. p. 82).  Other than Plaintiff's conclusory allegations and sheer speculation, there is no evidence Defendants took any action in terminating Plaintiff because of her pregnancy.  See Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130 (2d Cir. 2006) (holding assertion of personal belief insufficient to show pretext); c.f. Valentine v. Standard & Poor's, 50 F.Supp.2d 262, 284 (S.D.N.Y. 1999) (an employee's subjective disagreement with her manager's evaluation of her performance is not a viable basis for a discrimination claim); Rosen v. Columbia Univ., 1995 WL 464991, at * 7 (S.D.N.Y Aug. 7, 1995) ("it is the perception of the decision-maker, and not that of plaintiff, which is relevant"); Thornley v. Penton Publi'g., Inc., 104 F.3d 26, 30 (2d Cir. 1997) (requiring subjective demonstration of "satisfactory job performance, in accordance with the particular employer's criteria"); (W. World ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (mere speculation or conjecture is also insufficient).

Other than her conclusory statements, Plaintiff has advanced only one argument in support of her claim of pretext. She claims that because she was an exemplary employee, Defendants' justification must be pretextual.  Not only is this not supported by the evidence as set forth above,

---

[3] Significantly, Bhoorasingh was unaware of Plaintiff suffering from any "condition," prior to or during her pregnancy.  (Bhoorasingh Tr. p. 36-39)

an employee's subject opinion about her qualifications is "insufficient to give rise to a triable issue of fact concerning whether the employer's proffered reason for it actions is a pretext for discrimination." Layaou v. Xerox Corp., 999 F.Supp. 426, 432 (W.D.N.Y.1998).

In sum, Plaintiff has put forth no evidence, other than her own assertion, that she was terminated due to her pregnancy. As there is no evidence from which a jury could determine that Plaintiff's termination was undertaken under any circumstances giving rise to an inference of discrimination, nor that Defendants' legitimate non-discriminatory reasons for the termination amount to pretext for unlawful pregnancy discrimination, Defendants' motion should be granted. Perry v. N.Y. Dep't of Labor, 2009 WL 2575713, at * 3-4 (S.D.N.Y. Aug. 20, 2009) aff'd 2010 WL 3611401 (2d Cir. Sept. 17, 2010) (dismissing plaintiff's discrimination claim because plaintiff had "failed to set forth any allegaitons that raise a possible inference of discriminatory motivation").

## CONCLUSION

For the foregoing reasons, Defendants Knuckles, Komosinski & Manfro, LLP. and Debbie Bhoorasingh respectfully request that their Motion for Summary Judgment be granted, and Plaintiff's Complaint dismissed with prejudice.

DATED: November 11, 2019

> Knuckles, Komosinski & Manfro, LLP.
>
> By: s/ John E. Brigandi
>     JOHN E. BRIGANDI
>
> 50 Tice Boulevard, Suite 183
> Woodcliff Lake, New Jersey 07677
> (201) 391-0532
> jeb@kkmllp.com