USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/16/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MANDIP SINGH,

                              Plaintiff,

        -against-

KNUCKLES, KOMOSINSKI & MANFRO, LLP,
and DEBBIE BHOORASINGH, individually,
                              Defendants.

No. 18-cv-3213 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge Román

        Plaintiff Mandip Singh ("Plaintiff") brings this action against her former employer,

Defendant Knuckles, Komosinski & Manfro, LLP ("KKM"), and Defendant Debbie

Bhoorasingh (together with KKM, "Defendants"), alleging violations of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the New York State Human

Rights Law ("NYSHRL"), New York Executive Law § 290, *et seq.* (ECF No. 1.) Plaintiff alleges

Defendants unlawfully terminated her due to her pregnancy and gender.

        Presently before the Court is Defendants' motion for summary judgment seeking to

dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 56. (ECF No.

36.) For the following reasons, Defendants' motion is DENIED.

## BACKGROUND

The following pertinent facts are derived from the parties' respective Local Rule 56.1

statements and the record and are undisputed unless otherwise indicated.

## Defendant's Pre-Pregnancy Employment

On October 31, 2016, Plaintiff began employment with KKM as a clerk in the Evictions

Department. (Defs' Local Rule 56.1 Statement ("Def. 56.1") (ECF No. 40) ¶ 2; Pl.'s Response to

Def. 56.1 ("Pl. 56.1 Resp.") (ECF No. 45) ¶ 2.) On January 10, 2017, Plaintiff was reassigned to

the Foreclosure Sales Department. (*Id.*) Plaintiff's hourly rate remained the same in her new role.

(*Id.*) The parties dispute the reason for Plaintiff's reassignment. According to Defendant

Bhoorasingh, the reassignment was "due to inter personnel issues with other members of the

eviction staff [and because] the staff was not working together cohesively due to Plaintiff's

excessive absences and failure to complete her duties in a timely manner." (Declaration of

Debbie Bhoorasingh ("Bhoorasingh Decl.") ¶ 2.) However, Plaintiff testified that she had no

problems with any of her co-workers while working in the Evictions Department. (Deposition of

Mandip Singh ("Singh Dep.") 25:20-22). Further, Defendant Bhoorasingh testified that the

alleged conflicts were between all members of the team. (Deposition of Debbie Bhoorasingh

("Bhoorasingh Dep.") 44:12-20.) At the time of the reassignment, Plaintiff had worked at KKM

for approximately two-and-a-half months and had been absent from work twice and left early

once.[1] Plaintiff testified that she had volunteered to help with the Sales Department when the

Evictions Department was slow. (Pl. Ex. E at Pl. Dep. 26:4-27:3.)

---

[1] On November 10, 2016, Plaintiff left work early at 12:44 p.m. due to a family emergency. (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.) On December 5, 2016, Plaintiff left a voicemail stating she was not feeling well and would not be coming to work. (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.) On December 22, 2016, Plaintiff sent Defendant Bhoorasingh a text message stating she was not feeling well and would not be coming to work. (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.)

Under KKM policy, after ninety days of employment, all employees are entitled to thirteen days' unpaid leave during each calendar year. (Def. 56.1 ¶ 3; Pl. 56.1 Resp. ¶ 3.) Prior to ninety days of employment, employees are only eligible for unpaid leave. (*Id.*) From Plaintiff's first day of employment on October 31, 2016, through January 18, 2017, Plaintiff was absent or left work early a total of six times and was not compensated accordingly.[2] (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.)

On or about February 3, 2017, Defendant Bhoorasingh held a meeting with Plaintiff's supervisor and the foreclosure staff to discuss, among other things, Plaintiff's performance.[3] (Def. 56.1 ¶¶ 11; Pl. 56.1 Resp. ¶¶ 11.) Following the meeting, Defendants assigned more staff to the Foreclosure Sales Department. (*Id.*) Defendant Bhoorasingh declared that the assignment of more staff was for the purpose of helping complete Plaintiff's duties in a timely manner. (Bhoorasignh Decl. ¶ 11.) Plaintiff disputes that this was the reason for the assignment of more staff. (Def. 56.1 ¶¶ 11; Pl. 56.1 Resp. ¶¶ 11.) As a result of this meeting, KKM instituted a process detailing when and how work should be performed for all of Plaintiff's tasks to ensure her workload could be completed by the close of each business day. (Def. 56.1 ¶¶ 12; Pl. 56.1 Resp. ¶¶ 12.)[4]

Between January 19, 2017 and May 24, 2017, Plaintiff was absent from work for

---

[2] As indicated in footnote 1, Plaintiff took three full or partial days off work during her time as an evictions clerk. On January 16, 2017, Plaintiff requested to leave work early because she was not feeling well. (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.) On January 17, 2017, Plaintiff sent Bhoorasingh a text message advising that she was not feeling well and would not be coming to work. (Def. 56.1 ¶¶ 9-10; Pl. 56.1 Resp. ¶¶ 9-10.) On January 18, 2017, Plaintiff was still not feeling well and did not return to work. (Def. 56.1 ¶¶ 9-10; Pl. 56.1 Resp. ¶¶ 9-10.)

[3] Defendants allege that during this meeting, Bhoorasingh was informed by Plaintiff's supervisor and colleagues that Plaintiff was again not meeting deadlines. The Court agrees with Plaintiff that this constitutes inadmissible hearsay and therefore will disregard it. *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).

[4] Defendants further allege that Plaintiff's supervisor assisted this process by creating a template for Plaintiff to utilize her in daily tasks, which included goals to be completed by the end of each day to avoiding overburdening Plaintiff. (*Id.*) Plaintiff objects to the characterization of anything performed by Plaintiff's supervisor as unsupported by admissible evidence. The Court agrees that there is no testimony as to the Plaintiff's supervisor's action by anyone with personal knowledge.

3

approximately twelve full or partial days, primarily for medical reasons.[5] On May 5, 2017, Defendant Bhoorasingh held a meeting with Plaintiff to discuss KKM's expectations of her employment. (Def. 56.1 ¶¶ 22; Pl. 56.1 Resp. ¶¶ 22.) During that meeting, Defendant Bhoorasingh advised Plaintiff that she must complete her work in a timely manner, as failure to do so was causing pending foreclosure sales to be adjourned or canceled at a cost to KKM's clients. (*Id.*)

**<u>KKM's Reaction to Plaintiff's Pregnancy</u>**

On May 25, 2017, Plaintiff advised via text message that she was not feeling well and would not be coming to work. (Def. 56.1 ¶¶ 25; Pl. 56.1 Resp. ¶¶ 25.) Later that afternoon, Plaintiff advised Defendant Bhoorasingh via text message that she had strep throat and was pregnant. (Def. 56.1 ¶¶ 26; Pl. 56.1 Resp. ¶¶ 26.) Plaintiff further advised Defendant Bhoorasingh that she would provide a doctor's note indicating she would no longer be contagious as of May 28, 2017, and would be able to return to the office on May 29, 2017.[6] (*Id.*) As a result of Plaintiff's absence, and in order to avoid the adjournment of upcoming foreclosure

---

[5] On February 13, 2017, Plaintiff advised via text message that she was not feeling well and would not be coming in for work. (Def. 56.1 ¶¶ 14; Pl. 56.1 Resp. ¶¶ 14.) On February 17, 2017, Plaintiff left work early due to a doctor's appointment. On February 16, 2017, emailed Bhoorasingh asking if she could come in early so that the day would not count against her. (Def. 56.1 ¶¶ 15; Pl. 56.1 Resp. ¶¶ 15.) On February 23, 2017, Plaintiff left work early at 10:32 am as she was not feeling well and needed to go to the hospital. (Def. 56.1 ¶¶ 16; Pl. 56.1 Resp. ¶¶ 16.) On February 24, 2017, Plaintiff did not come into work as she had a doctor's note from her hospital visit. (Def. 56.1 ¶¶ 17; Pl. 56.1 Resp. ¶¶ 17.) On March 23, 2017, Plaintiff advised via text message that she was not feeling well and would not be coming in to work. (Def. 56.1 ¶¶ 18; Pl. 56.1 Resp. ¶¶ 18.) Plaintiff also indicated that she would provide a doctor's note. (*Id.*) On March 30, 2017, Plaintiff asked to be excused from work the following day due to a death in her family. (Def. 56.1 ¶¶ 19; Pl. 56.1 Resp. ¶¶ 19.) On April 12, 2017, Plaintiff requested a half-day. (Def. 56.1 ¶¶ 20; Pl. 56.1 Resp. ¶¶ 20.) From April 26, 2017 through April 28, 2017, Plaintiff was excused from work due to a medical procedure. (Def. 56.1 ¶¶ 21; Pl. 56.1 Resp. ¶¶ 21.) Plaintiff requested the day off on April 4, 2017. On May 18, 2017, Plaintiff advised Bhoorasingh via text message that she was not feeling well and would not be coming to work. (Def. 56.1 ¶¶ 23; Pl. 56.1 Resp. ¶¶ 23.) On May 23, 2017, Plaintiff came in to work late at 11:51 am, due to car trouble. (Def. 56.1 ¶¶ 24; Pl. 56.1 Resp. ¶¶ 24.)

[6] Defendants also allege that, as of May 26, 2017, Plaintiff used all thirteen paid leave days she had accrued in January. (Def. 56.1 ¶¶ 13; Pl. 56.1 Resp. ¶¶ 13.) Plaintiff disputes this allegation and indicates that often Plaintiff took off less than a full day on multiple occasions, including February 17, 2017; April 12, 2017; and May 23, 2017. (Pl. 56.1 Resp. ¶¶ 13.)

sales at a cost to KKM's clients, KKM management assigned additional staff to the foreclosure sales department on May 25, 2017. (Def. 56.1 ¶¶ 27; Pl. 56.1 Resp. ¶¶ 27.)

Plaintiff returned to work on May 30, 2017.[7] At 9:51 A.M., Tiffany Olin sent an email to Plaintiff stating: "The following sale packages need to be prepared and served today. Please confirm when same is done. There should be no issue with getting this done." (ECF No. 38-8 at Singh 086.)

Plaintiff responded at 10:04 A.M., CC'ing Defendant Bhoorasingh: "I'm running searches now. I'll do as many sale packages as I can." (*Id.*)

At 10:15 A.M. Defendant Bhoorasingh responded to Plaintiff and Tiffany Olin: "Please let me know by 1pm where we are in getting the below pkgs prepared." (*Id.*)

At 10:34 A.M. Olin responded to Defendant Bhoorasingh, removing Plaintiff from the email chain, stating: "[t]his is not going to be ok. . . . 'as many as she can' isn't going to cut it. There are 13 sale packages on that list. If she spends 30 minutes per package that is 6.5 hours. This is do-able. It doesn't take two hours to run searches." (*Id.*)

At 11:21 A.M. that day, Defendant Bhoorasingh emailed Defendant Knuckles and Jordan Manfro:

> So Tiffany is leaving early because she doesn't feel well. [Plaintiff] was sent the attached email from Tiffany of pkgs to do and as of 10:50am had not started on any of them. I've now asked Catrina to prepare all pks as they must go out by today/tomorrow. I'm calling HR now to see the best way to deal with Mandip. I think the next clerk should into pre-sale dept. I really don't think Mandip wants to do this anymore and is looking for a reason to quit.

(Pl. Ex. A (ECF No. 43-1) at Singh 210.) At 11:45 AM, Defendant Knuckles responded:

> We have to terminate Mandip. HR will have to advise us of the best way. I am sure we will have to sit with her and advise her that she is not performing her job. That she is not at her desk and is underperforming. To explain to her that Catrina did her entire job several days last week and was able to help in Referee closings and

---

[7] May 29, 2017 was a holiday.

> perform her usual REO work. Then put these things in writing and warn her that this is her final notice. Tiffany is a problem also, but I guess if were to get a talented clerk, Tiffany would magically not feel sick anymore.

(*Id.* at Singh 209.)

On June 3, 2017, Plaintiff's supervisor provided Plaintiff with an updated process detailing when and how all work should be performed for assigned tasks. (Def. 56.1 ¶¶ 30; Pl. 56.1 Resp. ¶¶ 30.)

Plaintiff left work early on June 5, 2017 because she was sick and needed to go to the hospital. (Def. 56.1 ¶¶ 32-33; Pl. 56.1 Resp. ¶¶ 32-22.) Plaintiff was placed on bed rest from June 5, 2017 through June 13, 2017. (*Id.*) On June 6, 2017 at 6:52 AM, Plaintiff texted Defendant Bhoorasingh: "Good morning Debbie. I'm on bed rest for the week. Doctors note will be emailed to u. Thank you." (Def. Ex. A at Singh Confidential 118.) Ten minutes later Defendant Bhoorasingh emailed Knuckles: "Text that [Plaintiff] is on bed rest. We need to terminate asap. Have Jordan get another clerk for sales while I find a full time person. This is clearly not working out." (Pl. Ex. B at Singh 111.) Plaintiff sent Defendant Bhoorasingh a copy of her medical note excusing her from work from June 5 through June 13, 2020. (Def. 56.1 ¶¶ 35; Pl. 56.1 Resp. ¶¶ 35.)[8]

On June 12, 2020, Defendant Bhoorasingh sent Plaintiff's medical note to Cathy Gatto, a Human Resources specialist, inquiring as to whether Plaintiff's medical note was sufficient. Gatto responded:

> It is sufficient to have excused from work but still get the disability forms as a precaution. Also, if she does return, she will still need to have the conversation about her job responsibilities and if she finds that she will not make required deadlines that she still needs to alert/inform her manager. You can begin to document her performance while she is pregnant. You just can't act on it just yet. Let me know if you have any other concerns.

---

[8] Defendant Bhoorasingh requested that Plaintiff call her. Instead, Plaintiff sent a copy of her medical note and Defendant Bhoorasingh thanked Plaintiff for the note and stated "I will see you when you return to the office later this week." (Pl. Ex. P at Singh 114.)

(Pl. Ex. R at Singh 211-214.)

On June 14, 2017, Plaintiff was reassigned back to the Evictions Department. (Def. 56.1 ¶¶ 37; Pl. 56.1 Resp. ¶¶ 37.) Plaintiff's hourly rate and hours remained the same. (*Id.*) Defendants allege the re-assignment was "to avoid further cancellations of foreclosure sales resulting in additional fees and costs to be incurred by KKM's clients." (*Id.*) Plaintiff alleges the move was because "[t]hey felt as if with my pregnancy it would be easier for me to move back to evictions." (*Id.*)

**Patient Authorization Form**

On June 19, 2017, Plaintiff requested to the leave the office at 10:30 A.M. because she was not feeling well. (Def. 56.1 ¶¶ 39; Pl. 56.1 Resp. ¶¶ 39.) On June 20, 2017 at 8:14 AM, Plaintiff sent Defendant Bhoorasingh a copy of a hospital doctor's note excusing her from work from June 19, 2017 through June 21, 2017. (Ex. X at Singh 136.) That morning, Defendant Bhoorasingh met with Plaintiff's supervisor. (Def. 56.1 ¶¶ 42; Pl. 56.1 Resp. ¶¶ 42.)[9] At 12:52 PM, Defendant Bhoorasingh responded to Plaintiff's email and requested that Plaintiff complete a patient authorization form so KKM could communicate with Plaintiff's medical care provider to confirm she could perform duties assigned to her. (Def. 56.1 ¶¶ 43; Pl. 56.1 Resp. ¶¶ 43.) Although Plaintiff had provided a note excusing her from work, Defendant Bhoorasingh requested an additional note from Plaintiff's medical provider authorizing her return to work on June 22, 2017. (*Id.*) Defendants allege they imposed these requirements because KKM wanted to ensure it was providing reasonable accommodations to assist Plaintiff in her job duties. (*Id.*) Plaintiff disputes this rationale. (*Id.*)

---

[9] The Court again agrees that anything communicated by Plaintiff's supervisor at this meeting constitutes inadmissible hearsay. *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).

Two minutes after Defendant Bhoorasingh emailed the patient authorization form to Plaintiff, Defendant Bhoorasingh forwarded the email to Defendant Knuckles and Joseph Manfro with the message: "[Plaintiff] sent her drs [sic] note this am (see below) putting her out of office til [sic] 6-21-2017. As discussed with HR yesterday I've sent request to her for authorization to communicate with her dr. I think once she receives email she will tender her resignation." (Ex. X at Singh 136.) Defendant Bhoorasingh also testified that she believed Plaintiff would resign rather than concede broad access to her medical information. (Ex. K at Bhoorasingh Dep. 55:25-56:5.)

On the morning of June 22, 2017, Defendant Bhoorasingh spoke with Plaintiff via telephone and Plaintiff informed Defendant Bhoorasingh that she had not received an email from Defendant Bhoorasingh with the authorization form and she had already left her doctor's office. (Def. 56.1 ¶¶ 44; Pl. 56.1 Resp. ¶¶ 44.) During this conversation, Defendant Bhoorasingh informed Plaintiff that KKM wanted her to continue her employment but needed the additional doctor's note and signed patient authorization form to determine whether Plaintiff required work accommodations. (*Id.*) Plaintiff did not report to work following this telephone call on June 22, 2017. (*Id.*) Plaintiff testified that she did not report to work because Defendant Bhoorasingh stated that Plaintiff could not return unless she provided an updated doctor's note. (Pl. Ex. T at Singh 152, Singh Decl.) Plaintiff attempted to see her doctor that day in order to obtain the requested note, but was unable to do so until the following day. Plaintiff was again absent from work on June 23, 2017. (Def. 56.1 ¶¶ 45; Pl. 56.1 Resp. ¶¶ 45.) Plaintiff testified that she did not return to work because she was advised not to until she had an updated doctor's note. (Ex. E at Singh Dep. 57:5-58:13; Ex. M at Pl. Decl. ¶ 6.) Plaintiff was unable to see her medical provider until June 23, 2017. (Ex. E at Singh Dep. at 57:5-58:13; Ex. M at Pl. Decl. ¶ 6.)

On June 26, 2017, Plaintiff appeared at work with a note from her primary care provider stating in part: "This is to notify that [Plaintiff] is stable to go back to work with no restrictions." (Def. 56.1 ¶¶ 46; Pl. 56.1 Resp. ¶¶ 46; Singh Confidential 78.) Defendant Bhoorasingh advised Plaintiff that she must additionally complete the patient authorization form prior to returning to work. (Def. 56.1 ¶¶ 46; Pl. 56.1 Resp. ¶¶ 46.) After reviewing the authorization form, Plaintiff discussed it with Defendant Bhoorasingh. (Ex. M at Pl. Decl. ¶ 14-16.) Plaintiff indicated that she felt the form's scope was too broad and indicated she would submit a narrower version. (*Id.*) Plaintiff left the office at 9:34 A.M. and did not return. (Def. 56.1 ¶¶ 46; Pl. 56.1 Resp. ¶¶ 46.)

On June 27, 2017, Plaintiff did not appear for work. (Def. 56.1 ¶¶ 47; Pl. 56.1 Resp. ¶¶ 47.) Plaintiff asserts she did not return to work because Defendant Bhoorasingh had advised that she could not return until she had executed a patient authorization form. (*Id.*) At 1:46 P.M. on June 27, 2017, Defendant Bhoorasingh sent an email to Plaintiff reminding her that employees are required to contact her if they are not coming into work or are going to be late. (Pl. Ex. T at Singh 153.) Defendant Bhoorasingh also asked Plaintiff whether she had finished completing the authorization form and informed Plaintiff that she "would need the authorization from [Plaintiff] no later than Thursday, June 29, 2017 as it was [her] expectation to have received it [on June 26, 2017]." (*Id.*) Plaintiff responded that she had emailed it on June 26, 2017 and would email it again. (*Id.*)

At 6:25 A.M. on June 28, 2017, Defendant Bhoorasingh responded to Plaintiff's email stating that she received no email communication from Plaintiff on June 26, 2017. (Pl. Ex. R at Singh 152.) Defendant Bhoorasingh indicated she reviewed Plaintiff's proposed changes to the authorization form and that Plaintiff would need to fix a typo (changing "employee" to "employer") and sign and return the form that day. (*Id.*) Defendant Bhoorasingh indicated that

upon receipt of the signed form, she would reach out to Plaintiff's physician and have the physician confirm orally and in writing that Plaintiff was able to perform all work duties assigned to her. (*Id.*) Defendant Bhoorsingh advised that following the physician's confirmation, she would contact Plaintiff and confirm that she could return to work. (*Id.*)

On June 30, 2017,[10] Plaintiff sent Defendant Bhoorasingh an email attaching the patient authorization form and providing contact information for her medical provider, Dipan Kaur ("Kaur"). (Def. 56.1 ¶¶ 49; Pl. 56.1 Resp. ¶¶ 49.) Defendant Bhoorasingh advised her that she would reach out to her doctor on July 5, due to the holiday weekend. Plaintiff thanked Defendant Bhoorasingh for all she had done to accommodate her needs. (*Id.*)

On July 5, 2017, Defendant Bhoorasingh attempted to contact Kaur. The contact information provided by Plaintiff directed Defendant Bhoorasingh to a receptionist who advised Defendant Bhoorasingh that Kaur did not work there and provided an alternate phone number. Defendant Bhoorasingh then called the alternate number and was advised she was speaking with the office of Dr. Naqvi and that Dr. Naqvi was unable to speak with her because he was with a patient. Dr. Naqvi's office advised that, although they had no record of Plaintiff at the facility, Plaintiff could be under the care of Kaur based on a hospital or nursing home visit. (Def. 56.1 ¶¶ 50; Pl. 56.1 Resp. ¶¶ 50.)

Defendant Bhoorasingh advised Plaintiff of her telephone conversation with Dr. Naqvi's office. Plaintiff explained that, although she considered Kaur to be her doctor, Kaur was licensed as a nurse practitioner rather than a doctor.[11] In response, Defendant Bhoorasingh sent a fax to

---

[10] Plaintiff testified that she did not provide the signed form to Defendant Bhoorasingh until June 30, 2017 because she was ill between June 28 and June 29. (Pl. Ex. U at Singh Confidential 90.)

[11] According to Defendants, Dipan Kaur, whom Plaintiff described as a friend from the local temple, did not provide any treatment to Plaintiff for her pregnancy. (Def. 56.1 ¶¶ 52; Pl. 56.1 Resp. ¶¶ 52.) Plaintiff disputes

Kaur requesting: (a) confirmation that Plaintiff could work Monday to Friday from 9 am to 5pm, in front of a computer; (b) confirmation that Plaintiff could use standard office machinery such as a copy machine, scanner, postage machine; and (c) information as to whether Plaintiff would require any accommodations for her employment. (Def. 56.1 ¶¶ 51; Pl. 56.1 Resp. ¶¶ 51.)

According to Defendants, Kaur—whom Plaintiff described as a friend from the local place of worship—did not provide any treatment to Plaintiff related to her pregnancy. (Def. 56.1 ¶¶ 52; Pl. 56.1 Resp. ¶¶ 52.) Plaintiff disputes this characterization and argues that Defendants do not cite to any testimony by Plaintiff on this point and it is therefore inadmissible hearsay. (*Id*.) Plaintiff further disputes that Kaur did not provide treatment for Plaintiff's pregnancy and asserts that Kaur provided her with treatment for gastric symptoms during her pregnancy. (*Id*.)

On July 6, 2017, Defendant Bhoorasingh advised Plaintiff that KKM was still waiting for a signed letter from Kaur. On July 10, 2017, Defendant Bhoorasingh received a letter from Kaur advising Plaintiff could return to work immediately, without any accommodations. At 7:21 P.M., Defendant Bhoorasingh sent an email to Plaintiff that evening advising she could return to work. However, Plaintiff had several appointments on July 11, 2017, and was not able to return to the office until July 12, 2017. (Def. 56.1 ¶¶ 54; Pl. 56.1 Resp. ¶¶ 54.)

**<u>Plaintiff's Termination</u>**

On July 14, 2017, Plaintiff advised Defendant Bhoorasingh that she would be late for work on July 18, 2017 due to a doctor's appointment. (Def. 56.1 ¶¶ 57; Pl. 56.1 Resp. ¶¶ 57.) At 10:39 AM, Plaintiff notified Defendant Bhoorasingh that her appointment was taking longer than expected. Later that day, Plaintiff sent another text message saying "Sorry for the delay but I had

---

this characterization and argues that Defendants do not cite to any testimony by Plaintiff on this point and it is therefore inadmissible hearsay. (Id.) Plaintiff further disputes that Kaur did not provide treatment for Plaintiff's pregnancy and asserts that Kaur provided her with treatment for gastric symptoms during her pregnancy. (Id.)

to get a scan because they wasn't sure everything was ok so I had to go to fetal medicine. Everything is ok. Thank u." Plaintiff did not appear at work that day.

On July 21, 2017, Plaintiff sent Defendant Bhoorasingh a text message advising she was not feeling well and would not be coming to work. (Def. 56.1 ¶¶ 58; Pl. 56.1 Resp. ¶¶ 58.) Plaintiff testified at her deposition that she had been unable to work on July 21, 2017 because she had suffered a fall the night before. (*Id.*) This information was not conveyed to Defendant Bhoorasingh. (Def. 56.1 ¶¶ 59; Pl. 56.1 Resp. ¶¶ 59.) On July 21, 2017, Defendant Bhoorasingh sent an email to Plaintiff terminating her employment with KKM. (Def. 56.1 ¶¶ 60; Pl. 56.1 Resp. ¶¶ 60.)

According to Defendants, Plaintiff was terminated for her inability to be at work on a consistent basis and inability to perform duties assigned to her in a timely manner, both of which caused KKM to re-assign its employees to complete Plaintiff's duties at an additional expense. (Def. 56.1 ¶¶ 61; Pl. 56.1 Resp. ¶ 61.) Plaintiff disputes this characterization. Plaintiff testified that "Everything had changed after my pregnancy as far as coming back to work and providing doctor's notes and the behavior, the attitude, everything revolving around my pregnancy and coming back to work has changes." (Pl. Ex. E at Pl. Dep. At 68:25-69:5.) Plaintiff also testified that Defendant Bhoorasingh's attitude towards her changed "[r]ight after I told her I was pregnant." (Pl. Ex. E at Pl. Dep. At 82:14-18.) Plaintiff suffers from irritable bowel syndrome ("IBS"), which worsened during her pregnancy and caused her to feel that she needed to take extra care when potential medical issues arose. (Pl. Ex. M at Pl. Decl. ¶ 2, 4-5.) Plaintiff testified that she "had a condition before pregnancy which it seemed like it was okay" (Pl. Ex. E at Pl. Dep. at 68:20-21).

**Statements Regarding Plaintiff's Performance and Qualifications**

Defendant Knuckles testified that he "thought that [Plaintiff] was smart" and that "she could do the job." (Pl. Ex. C at Knuckles Dep. 25:14-15.) On May 6, 2017, Plaintiff came into work despite having been in the emergency room the night before. (Pl. Ex. E at Pl. Dep. 85:17-86:6; Pl. Ex. P at Singh Confidential 114.)[12] Defendant Bhoorasingh then complimented Ms. Singh in a text message, writing: "Hi Mandip, I wanted to thank you for coming in after being in the ER. Really appreciate it." (Ex. P at Singh Confidential at 114.) Defendant Bhoorasingh also testified that when Plaintiff "showed up and did her job and was at her desk, yes, she could do her job." (Bhoorasingh Dep. 56:15-16.)

## LEGAL STANDARD

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013).

A court should grant summary judgment when a party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (internal quotation marks omitted).

---

[12] The Court will not consider statements made by Plaintiff's supervisor Margarita Bjorkander because the statements constitute inadmissible hearsay.

In deciding a motion for summary judgment, the Court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). However, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Further, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008) ("Even in the discrimination context ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

## DISCUSSION

Defendants argue they are entitled to summary judgment dismissing Plaintiff's discrimination claims under Title VII and the NYSHRL. For the following reasons, the Court disagrees.

## I.    Title VII Sex Discrimination Claim

Title VII provides that an employer cannot discriminate against "any individual" based on his or her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1344-45 (2015). *See also* 42 U.S.C. §2000e(k). "The ultimate issue in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment action was motivated, as least in part, by an impermissible reason, i.e., that there

was discriminatory intent." *Baffa v. STAT Health Immediate Medical Care, P.C.*, 2013 WL 5234231, at \*7 (E.D.N.Y. Sept. 17, 2013) (internal quotes omitted) (citing *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997).

On a motion for summary judgment in a case wherein a plaintiff asserts that the employer's decision was a pretext for discrimination, the plaintiff's discrimination claim is subject to the *McDonnell Douglas* burden-shifting standard. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015). Under this framework, a plaintiff bears the initial burden of demonstrating her *prima facie* case. *Cortes v. MTA New York Transit*, 802 F.3d 226, 231 (2d Cir. 2015). "To establish a *prima facie* case of discrimination under Title VII, a plaintiff must prove that (1) she is a member of a protected class; (2) she is qualified for the position held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Stratton v. Department for the Aging for City of New York*, 132 F.3d 869, 878 (2d Cir. 1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To establish an inference of discrimination, a plaintiff must prove that an adverse employment action was taken against her "because of discriminatory animus on the part of [her] employer." *See Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999).

"The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minim[i]s.*" *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal quotation marks omitted) (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1994). Once a plaintiff demonstrates a *prima facie* case, a "presumption arises that the employer unlawfully discriminated." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). The

burden "shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *McDonnell Douglas Corp.*, 411 U.S. at 802. If the employer articulates a non-discriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–11 (1993).

The "final and ultimate burden" then returns to the plaintiff to demonstrate that "defendant's reason is in fact [a] pretext for unlawful discrimination." *See Cortes*, 802 F.3d at 231. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted) (citation omitted). Alternatively, a plaintiff may meet its final burden by relying on direct or indirect evidence demonstrating that "an impermissible reason was a motivating factor, without proving that the employer's proffered explanation played no role in its conduct." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (internal quotations omitted) (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir.1997)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42.

A.  *Plaintiff's Prima Facie Case*

The parties agree Plaintiff is a member of a protected class and suffered an adverse employment action. Defendants, however, dispute whether Plaintiff "performed her job satisfactorily" and was terminated "under circumstances giving rise to an inference of discrimination." (ECF No. 37 at 14.)

16

**Plaintiff's Qualifications**

To establish a *prima facie* case of discrimination, Plaintiff must demonstrate she was qualified for the position.[13] Plaintiff "need only make the minimal showing that she possesses the basic skills necessary for performance of [the] job." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (quotation marks omitted). Where "an employer has hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw." *Id.* at 696. "To show 'qualification' sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff 'need not show perfect performance or even average performance.'" *Gregory*, 243 F.3d at 696 (quoting *Flower v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir. 1977)).

As evidence of her qualifications, Plaintiff offers Defendant Knuckles's testimony: "I thought that [Plaintiff] was smart. I thought she could do the job." (ECF No. 44 at 5; Knuckles Deposition 25:14-15.) Further, "Defendants do not dispute that Plaintiff was qualified for her position when she was hired." (ECF No. 41 at 5.) This is consistent with Defendant Bhoorasingh's testimony that when Plaintiff "showed up and did her job and was at her desk, yes, she could do her job." (Bhoorasingh Dep. 56:15-16.)

Defendants essentially argue that regardless of Plaintiff's capabilities, her excessive

---

[13] The parties dispute how to interpret this requirement. Defendants argue Plaintiff must demonstrate "she satisfactorily performed the duties required by [her] position." (Def. Brief at 11-12); *Quarantino v. Tiffany & Co.*, 71 F.3d 58 (2d Cir. 1995). Plaintiff, on the other hand, argues that Plaintiff need only demonstrate that she is "qualified" and "she possesses the basic skills necessary for performance of [the] job." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (quotation marks omitted) (citing *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) and *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)). Upon analyzing the case law, it is clear that Plaintiff need only demonstrate she possess the necessary qualifications for the position. However, Plaintiff's performance can be a factor in determining whether she is qualified for the position because performance reveals whether she has the requisite skills. *See Gregory, 243 F.3d at* 696 (finding plaintiff qualified where she was hired, retained for a long period of time, and promoted); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (finding plaintiff proved a *prima facie* cases where plaintiff had undisputed qualifications and satisfactory past performance); *Quarantino*, 71 F.3d 58 at 64 (referring to plaintiff's satisfactory performance as "her qualifications").

absences rendered her unqualified. They argue Plaintiff was absent or took partial days on forty-eight occasions during her roughly nine-month tenure at KKM, and in some instances failed to provide notice to KKM. KKM argues that Plaintiff's reassignment on January 10, 2017 from the Evictions Department to the Foreclosure Sales Department "due to personnel issues with the eviction staff caused by Plaintiff's excessive absences and failure to timely complete her work" is further evidence of Plaintiff's lack of qualifications. Further, they note that "KKM had no choice but to re-assign Plaintiff back to the evictions department on June 14, 2017, due to Plaintiff's failure to consistently come to work. (Bhoorasingh Decl. ¶ 37.) Defendants point to discussions with Plaintiff and opportunities and accommodations provided to show that they gave Plaintiff many opportunities to improve her performance.

The Court is unpersuaded. While the Court agrees Plaintiff's performance can be relevant to her qualifications, the bar is low.[14] The parties agree Plaintiff was capable of doing the work when she was present. Plaintiff was frequently absent prior to announcing her pregnancy and KKM continued to employ her. Further, most of Plaintiff's absences occurred *after* Defendants decided to terminate Plaintiff and many occurred during the time period during which Plaintiff was completing the authorization form and Defendants were soliciting information from Plaintiff's medical provider.

Defendants argue that Plaintiff's qualifications are beside the point and that finding a *prima facie* case here would overlook "the most basic concept of a discrimination case – that an employer may terminate an employee when it has a legitimate non-discriminatory basis for termination." (ECF No. 41 at 3.) For this proposition, Defendants cite to *Gregory*, but the Court

---

[14] The Court also notes that the cases cited by the parties involve incidents where work performance was used to establish qualifications, not to negate them.

interprets *Gregory* quite differently.[15] As *Gregory* notes, while the qualification prong exists to ensure that termination did not result from an "absolute or relative lack of qualifications" and "[a]n employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for [termination,] . . . the qualification prong … cannot be transformed into a requirement that the plaintiff anticipate and disprove an employer's explanation that … performance justified the job action at issue." *Gregory*, 243 F.3d at 696-97. As such, the Court finds that Plaintiff has satisfied the "qualification" prong.

## Inference of Discrimination

Defendants argue that the circumstances of Plaintiff's termination do not give rise to an inference of discrimination. To support this argument, Defendants cite to Plaintiff's frequent absences and the measures Defendants took to help Plaintiff succeed in her role.

Plaintiff, on the other hand, points to the temporal proximity between KKM learning of her pregnancy and KKM's decision to terminate her as evidence of discrimination. *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019); *Smith v. Miller*, 2017 U.S. Dist. LEXIS 176078, at *22 (S.D.N.Y. 2017).

It is undisputed that Defendants internally discussed their intention to terminate Plaintiff on May 30, 2017, just two workdays after learning of Plaintiff's pregnancy. Defendant Knuckles emailed Defendant Bhoorasingh, "[w]e have to terminate [Plaintiff]. HR will have to advise us of the best way." Further, on June 6, 2017, just ten minutes after Defendant Bhoorasingh learned that Plaintiff had been placed on bedrest, she emailed Defendants Knuckles: "[t]ext that

---

[15] Although *Gregory* involves a Rule 12(b)(6) motion, nothing in the text of the opinion suggests that its does not apply to an analysis of a *prima facie* case under Rule 56. Further, Defendants quote *Gregory* out of context. For example, Defendants state *Gregory* "provides guidance that '[a]n employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately prove a legitimate, non-discriminatory reason for the employer's adverse action." (ECF No. 41 at 4) (citing *Gregory*, 243 F.3d at 696). However, the Court reads that portion of the opinion to indicate that the bar for demonstrating minimal qualifications is low; however, the establishment of a *prima facie* case does not prohibit a defendant from ultimately prevailing.

[Plaintiff] is on bed rest. We need to terminate asap. . . .This is clearly not working out."
Plaintiff's bedrest marked her first absence due to pregnancy. Plaintiff was ultimately terminated
on July 21, 2017, less than two months after announcing her pregnancy. Plaintiff also testified
that Defendant Bhoorasingh's treatment of her changed drastically after she announced her
pregnancy. Defendants' intention to terminate Plaintiff upon learning about her pregnancy
coupled with (2) Defendants' implementation of a strategy to alienate her into resigning from her
position is more than sufficient to meet Plaintiff's burden that the circumstances under which she
was terminated give rise to an inference of discrimination. *See, e.g.*, *Lenzi*, 944 F.3d at 108.

*       *       *

Therefore, the Court finds that Plaintiff has established a *prima facie* case.

B. *Employer's Legitimate, Non-Discriminatory Reason for Termination*

The Court finds, and Plaintiff does not dispute, that KKM is able to provide a legitimate,
non-discriminatory reason for termination. The evidence suggests that Plaintiff was frequently
absent from work, failed to make deadlines, and may have had interpersonal issues with other
employees. Accordingly, the burden shifts back to Plaintiff to establish that Defendants' basis for
termination is a pretext for discrimination.

C. *Pretext for Unlawful Discrimination or Unlawful Motivating Factor*

To survive a motion for summary judgment, Plaintiff must provide sufficient evidence of
pretext or that an impermissible reason was a motivating factor in her termination to raise a
triable issue of fact. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998); *Holtz*,
258 F.3d 62, 78-79 (2d. Cir. 2001).

Plaintiff asserts Defendants' proffered basis for termination—*i.e.*, that Plaintiff was
terminated because she was absent from work, failed to make deadlines, and had interpersonal

20

issues with employees—is merely a pretext for discriminatory termination. Plaintiff points to the temporal connection between Plaintiff's announcement of her pregnancy and Defendants' decision to terminate her. The Second Circuit recognizes that a strong temporal connection is circumstantial evidence of pretext but is insufficient in and of itself to demonstrate pretext. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998); *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Defendants decided to terminate Plaintiff only two workdays after she announced her pregnancy and actually terminated her less than two months later. However, Defendant Knuckles testified that KKM had previously discussed terminated Plaintiff "since the inception of her employment." (Knuckles Tr. at 25.)

In further support of this argument, Plaintiff notes that the actual language used by Defendants in their emails regarding Plaintiff's termination further evidences Defendants' discriminatory animus. For example, merely ten minutes after Plaintiff informed Defendant Bhoorasingh she would be on bed rest, Defendant Bhoorasingh emailed Defendant Knuckles: "Text that [Plaintiff] is on bed rest. We need to terminate asap. Have Jordan get another clerk for sales while I find a full time person. This is clearly not working out." (Pl. Ex. B at Singh 111.) This occurred less than two weeks after Plaintiff announced her pregnancy and was the first time Plaintiff missed work due to pregnancy.

Similarly, Plaintiff points to her testimony that "[e]verything had changed after my pregnancy as far as coming back to work and providing doctor's notes and the behavior, the attitude, everything revolving around my pregnancy and coming back to work has changed." (Pl. Ex. E, Singh Dep. 68:25-69:5.)

Defendants dispute that anything changed due to Plaintiff's pregnancy. Instead, Defendants point to Plaintiff's excessive absences, inability to meet deadlines, and interpersonal

issues as reasons for terminating her for poor performance. The parties agree that Plaintiff was spoken to multiple times regarding the importance of meeting deadlines and was given assistance to help complete her tasks. The parties also agree that Defendants had to reassign coworkers to complete Plaintiff's tasks. Defendants also rely on Plaintiff's January 10, 2017 reassignment from the Evictions Department to the Foreclosure Sales Department to demonstrate poor performance prior to her pregnancy. However, it is more appropriate for a jury to consider the persuasiveness of Defendant Bhoorasingh's explanation of the reassignment. Defendant Bhoorasingh declares that Plaintiff's excessive absences caused interpersonal and workload issues. However, Plaintiff worked in the department for approximately two-and-a-half months and was only out sick twice and left early once.

Finally, Plaintiff points to KKM's requirement that she complete a patient authorization form and provide an additional doctor's note to return to work following her bed rest from June 19 through June 21, 2017. Plaintiff believes the requirements were created as part of a scheme to force Plaintiff out of her position. Plaintiff had already provided a note indicating that she was able to return to work on June 22, 2017. However, Defendants wanted both an additional note indicating that she could work without restriction *and* an authorization form that would allow them to communicate directly with her medical provider for verbal and oral confirmation of Plaintiff's ability to work without restriction. It took over two weeks for Plaintiff to edit and sign the forms and Defendant to obtain the desired information from Plaintiff's medical provider. During that time, Defendants refused to permit Plaintiff to return to work. Defendants attribute most of this time to Plaintiff's delay in returning the form and Plaintiff's medical provider's delay in providing the request information to KKM. However, after requesting that Plaintiff obtain these documents, Defendant Bhoorasingh sent an email to Defendant Knuckles stating:

"[Plaintiff] sent her drs note this am (see below) putting her out of office til 6-21-2017. As discussed with HR yesterday I've sent request to her for authorization to communicate with her dr. I think once she receives email she will tender her resignation." (Ex. X at Singh 136.) Defendant Bhoorasingh also testified that she suspected Plaintiff would resign rather than cede access to her medical information. Defendants maintain they imposed this requirement out of concern for Plaintiff's wellbeing and to ensure they were accommodating her properly in the workplace.

All told, Defendant provides significant evidence of Plaintiff's poor performance including evidence of excessive absences, failure to complete work in a timely manner, and possible interpersonal issues. Defendants explained work expectations to Plaintiff multiple times, assigned coworkers to assist Plaintiff, and instituted new processes to assist her. Nevertheless, the Court finds that a reasonably jury could find that Defendants' proffered basis to terminate Plaintiff was mere pretext or was motivated by her pregnancy due to (1) the timing of KKM's decision to terminate Plaintiff, (2) the language of Defendants' email regarding Plaintiff's termination, (3) inconsistencies in Defendant Bhoorasingh's portrayal of Plaintiff's January reassignment, (4) evidence regarding KKM's changed expectations from Plaintiff following announcement of her pregnancy, and (5) KKM's requirement that Plaintiff obtain an authorization form, which it believed would cause Plaintiff to resign. As such, the Court finds a genuine dispute of material fact as to whether Plaintiff's termination was pretextual or motivated by an impermissible factor.

### NYSHRL Claims

The Second Circuit has held that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d

625, 629 n.1 (2d Cir. 1997); *see Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98,

107 n.10 (2d Cir. 2011); *Salomon v. Our Lady of Victory Hosp.*, 514 F3d 217, 226 n.9 (2d Cir.

2008). Therefore, the Court's analysis regarding Plaintiff's federal claims applies to her

NYSHRL claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED. The

Clerk of the Court is respectfully directed to terminate the motion at ECF No. 36. A pretrial

conference is scheduled for January 13, 2021 at 10:00 A.M. by teleconference. To access the

teleconference, please follow these directions: (1) Dial the Meeting Number: (877) 336-1839; (2)

Enter the Access Code: 1231334 #; (3) Press pound (#) to enter the teleconference as a guest.

Dated:   November 16, 2020                          SO ORDERED:
         White Plains, New York

_____

NELSON S. ROMÁN
United States District Judge